**E-FILED**
Monday, 27 February, 2006  03:16:11 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| JUMER'S CASTLE LODGE, INC., ) | |
| ) | Bankr. No. 99-83286 |
|      Debtor. ) | |
| _____ ) | |
| ) | |
| CREDITORS' COMMITTEE OF JUMER'S, ) | |
| CASTLE LODGE, INC., for and on ) | |
| behalf of JUMER'S CASTLE LODGE, ) | |
| INC., as debtor in possession of ) | |
| the above bankruptcy estate, ) | |
| ) | |
|      Plaintiff-Appellant, ) | |
|    v. ) | Adv. No. 01-8253 |
| ) | |
| D. JAMES JUMER, ) | Dist. Ct. No. 05-1178 |
| ) | |
|      Defendant-Appellee. ) | |

## OPINION

Before the Court is Appellant, Creditor's Committee of Jumer's Castle Lodge, Inc.'s ("Creditor's Committee") appeal from the Bankruptcy Court's Opinion of May 11, 2005, granting summary judgment in favor of Appellee, D. James Jumer ("Jumer"). For the reasons that follow, the decision of the Bankruptcy Court is AFFIRMED.

### I.
### BACKGROUND

The following facts are not in dispute. At all times relevant to the instant matter, Jumer was the principal shareholder of Debtor, Jumer's Castle Lodge, Inc. ("JCL"). JCL

was part of a chain of family-owned hotels primarily located in Central Illinois and best known for its medieval German architecture. In addition to its hotel operations, JCL also became involved in the riverboat casino business. However, by October of 1997, JCL had fallen on hard times, requiring Jumer to seek additional capital to fund its operations.

As a result of JCL's financial difficulties, Jumer began negotiating the sale of JCL with Frank Pedulla ("Pedulla") of Saranow Gaming Investors, Inc. ("Saranow"). Initially, Saranow was interested in purchasing JCL outright but developed concerns regarding JCL's asset structure. These concerns included:

(1) defaulted loans with two of JCL's primary lenders (Marine Bank and National City Bank);

(2) substantial cross-collateralization listed on JCL's corporate balance sheet as a result of numerous notes and accounts receivables due and owing to JCL from other enterprises and non-hotel assets owned by Jumer; and

(3) payments in the amount of $14,000 per month (or $168,000 per year) to lease the real property and improvements owned by Jumer but from which JCL's Galesburg Hotel ("JG property") was being operated.

To ease its concerns, Saranow proposed instead to purchase 30% of JCL's outstanding stock for a cash payment of $2,000,000, if, and, only if, Jumer and JCL fulfilled certain conditions set forth by Saranow and JCL's primary lenders. These conditions included:

(1)  Jumer transferring to JCL his entire ownership interest in the JG property (effectively eliminating $168,000 in lease payments per year from JCL to Jumer);

(2)  Jumer transferring to JCL his entire ownership interest in two parcels of real property adjacent to JCL's Peoria Hotel ("Peoria parcels");

(3)  Jumer transferring to JCL $1,000,000 in cash for partial satisfaction of numerous notes and accounts receivables due and owing to JCL from Jumer's other enterprises and non-hotel assets; and

(4)  Jumer accepting in exchange, all of JCL's non-hotel assets, including: inter-company accounts receivables due and owing to JCL, three automobiles, the existing cash value of Jumer's life insurance policy, and a gas station along with its inventory.

Saranow and JCL's primary lenders believed that the above-listed transfers would help put JCL on a healthy footing as an ongoing concern by increasing its appeal to outside investors and making it easier for JCL to obtain additional financing in the future.

Thus, pursuant to the conditions outlined above, the parties entered into two interrelated agreements on July 31, 1998: an Agreement for Sale of Real Property (covering the transfers of property, accounts receivables, and cash between Jumer and JCL) and a Securities Purchase Agreement (covering Saranow's purchase of 30% of JCL's outstanding stock). The execution of these agreements resulted in the following transfers:

(1)  JCL receiving full ownership interest in the JG property and the Peoria parcels;

(2)   JCL receiving $2,000,000 in capital from Saranow and a 1,000,000 cash payment from Jumer;

(3)   Saranow receiving 30% interest in JCL;

(4)   Jumer receiving an accounts receivable due and owing to JCL from Jumer's of St. Charles ("JSC"), an unrelated Jumer entity, with a book value of $2,767,545;

(5)   Jumer receiving additional accounts receivables due and owing to JCL from other enterprises owned by Jumer valued at $1,459,110;

(6)   Jumer receiving three automobiles valued at $64,000;

(7)   Jumer receiving ownership of the life insurance policies held by JCL with a cash value of $100,504; and

(8)   Jumer receiving a gas station along with its inventory valued at $106,493.

More than a year later, on October 13, 1999, JCL filed a petition for relief under Chapter 11 of the Bankruptcy Code.  As part of the bankruptcy proceedings, the Creditor's Committee filed suit against Jumer seeking to have the July 31, 1998 transfer of assets between Jumer and JCL avoided pursuant to 11 U.S.C. § 544(b).  The Creditor' Committee alleged that JCL never received *reasonably equivalent value* in exchange for the assets it transferred to Jumer, making the transfers in question fraudulent under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/1 *et seq*.

Both parties subsequently filed cross-motions for summary judgment and the Bankruptcy Court found in favor of Jumer.  In reaching its decision, the Bankruptcy Court held that there was

4

no violation of the IUFTA because JCL received more than *reasonably equivalent value* in exchange for the assets transferred to Jumer. The Creditor's Committee now appeals to this Court, alleging the Bankruptcy Court erred in reaching its decision.

The parties do not dispute the facts pertaining to the July 31, 1998 transfer of assets. What they do dispute, however, is the value of the JG property at the time of the transfer in question, and, whether the Bankruptcy Court erred in taking into consideration the fair market value of the JSC accounts receivable rather than merely relying on its book value. In addition, the Creditor's Committee argues that the Bankruptcy Court should not have taken into consideration the money JCL received from Saranow, because the Securities Purchase Agreement and the Agreement for Sale of Real Property were separate transactions. Finally, the Creditor's Committee argues that the burden of proof in this case should have been shifted to Jumer, as the defendant, because he was a corporate insider.

## II.
## STANDARD OF REVIEW

This Court has jurisdiction to review the decision of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). Under Bankruptcy Rule 8013, district courts are to apply a dual standard of review when considering a bankruptcy appeal. Fed.

R. Bankr. P. 8013. While a bankruptcy court's conclusions of law are reviewed *de novo*, its findings of fact must not be set aside unless clearly erroneous. In re Yonikus, 996 F.2d 866, 868 (7th Cir. 1993). As the Supreme Court explained:

> [a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.

Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (citation omitted).

A bankruptcy court's determination as to whether *reasonably equivalent value* has been given involves both questions of law and fact. See In re Thunderdome Houston Ltd. P'ship, 2000 U.S. Dist. LEXIS 8020, at *15-17 (N.D. Ill. June 7, 2000). That is, the legal standards used by the bankruptcy court to define and interpret the phrase "reasonably equivalent value," are questions of law subject to *de novo review*; but, once the correct legal standards have been identified and applied, the question as to whether *reasonably equivalent value* was actually given is a question of fact subject only to review for clear error. See In re Image Worldwide, LTD., 139 F.3d 574, 576 (7th Cir. 1998); In re First Commercial Mgmt. Group, Inc. v. Reinhardt, 279 B.R. 230, 235 (N.D. Ill. 2002). Hence, if it is

determined that the Bankruptcy Court applied the correct legal standards to the relevant facts, then absent clear error, this Court will not disturb the Bankruptcy Court's factual finding -- that *reasonably equivalent value* was indeed given to JCL in exchange for the assets transferred to Jumer.   See Daniels v. Essex Group, Inc., 937 F.2d 1264, 1269 (7th Cir. 1991) ("if the trial judge correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous") (citing Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982)).

Furthermore, the disposition of cross-motions for summary judgment requires the Court to determine as to each motion, whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).   Initially, the moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, to survive summary judgment, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a

7

genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87
(1986).  Neither "the mere existence of <u>some</u> alleged factual
dispute between the parties," <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 247 (1986) (emphasis in original), nor the
existence of "some metaphysical doubt as to the material facts,"
<u>Matsushita Elec.</u>, 475 U.S. at 586, is sufficient to defeat a
motion for summary judgment.  <u>See also</u> <u>Chiaramonte v. Fashion
Bed Group, Inc.</u>, 129 F.3d 391, 395 (7th Cir. 1997).  Instead,
the non-moving party "must present sufficient evidence to show
the existence of each element of its case on which it would bear
the burden at trial." <u>Filipovic v. K & R Express Sys., Inc.</u>,
176 F.3d 390 (7th Cir. 1999).

This Court, however, must "view the record and all
inferences drawn from it in the light most favorable to the
[non-moving party]." <u>Holland v. Jefferson Nat. Life Ins. Co.</u>,
883 F.2d 1307, 1312 (7th Cir. 1989).  Nevertheless, the Court is
not "required to draw every conceivable inference from the
record - only those inferences that are reasonable." <u>Bank Leumi
Le-Isreal, B.M. v. Lee</u>, 928 F.2nd 232, 236 (7th Cir. 1991).  In
essence, if the record before the court "could not lead a
rational trier of fact to find for the non-moving party," then
no genuine issue of material fact exists and, the moving party
is entitled to judgment as a matter of law.  <u>McClendon v.</u>

Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec., 475 U.S. at 587); Liberty Lobby, 477 U.S. at 248, 251-52.

## III.
## Analysis

For purposes of this appeal, the parties concede there is only one question at issue: Did JCL (the debtor) receive *reasonably equivalent value* under the IUFTA in exchange for the assets it conveyed to Jumer on July 31, 1998? If the answer to this question is yes, then summary judgment in favor of Jumer was indeed appropriate. If, on the other hand, the answer to this question is no, then summary judgment should have been granted in favor of the Creditors' Committee. It is only if the answer to this question raises a genuine issue of material fact should both parties have been denied summary judgment.

**A.    Factual disputes that are not "outcome determinative" are insufficient to preclude summary judgment.**

The Court finds it imperative at the onset to address what appears to be the blatant disregard for, or inexplicable ignorance of, the well-settled principles governing summary judgment by counsel on behalf of the Creditor's Committee. Indeed, counsel appears to have no inkling as to the purpose of summary judgment or what constitutes a genuine issue of material fact under Rule 56 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 56.

As the Seventh Circuit explained, "[t]he primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute." Farries v. Stanadyne/Chicago Div., 832 F.2d 374, 378 (7th Cir. 1987) (quoting Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis, 806 F.2d 146, 149 (7th Cir. 1986)). For a disputed fact to be *material* for purposes of precluding summary judgment, it must be "outcome determinative under the governing law." Dowden v. Polymer Raymond, Inc., 966 F.2d 1206, 1208 (7th Cir. 1992) (internal quotations omitted); In re Szabo, 2006 Bankr. LEXIS 24, at *5 (N.D. Ill. January 9, 2006). If the court's ultimate decision would remain unchanged regardless of which set of facts it were to believe, then the disputed fact cannot be deemed "outcome determinative" and, therefore, cannot preclude summary judgment. See Liberty Lobby, 477 U.S. at 248 (clarifying that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

Nonetheless, in the Creditor's Committee's appellate briefs, counsel repeatedly ridicules the Bankruptcy Court for what he perceives to be its obvious failure to identify a genuine issue of material fact for purposes of precluding summary judgment. Believing the Bankruptcy Court to be

10

completely incompetent to decide the matter, counsel goes as far as to accuse the Bankruptcy Court of blatantly ignoring the overwhelming evidence and "engag[ing] in torturous and flawed logic to back-up its decision." [Appellant's Br. at pg. 10]. However, the only thing this Court finds *torturous* is counsel's meritless arguments and near frivolous appeal on behalf of the Creditor's Committee.

Throughout the great majority of the Creditor's Committee's appellate briefs, counsel essentially makes one simple but flawed argument: that the discrepancy between the appraisals conducted by Douglas Nelson (valuating the JG property at $2,100,000) and Jay A. Seaton (valuating the JG property at $4,500,000) is sufficient, in itself, to create a genuine issue of material fact as to whether *reasonably equivalent value* was given in exchange for the property conveyed to Jumer. See [Appellant's Br. at pgs. 6-10; Appellant's Reply Br. at pgs. 5-8].

But in reaching its decision, the Bankruptcy Court did rely on the Creditor's Committee's valuation of the JG property (at $2,100,000) when calculating the total value of the assets transferred between Jumer and JCL. See [Bankr. Ct. Opinion of May 11, 2005, at pg. 13]. In fact, in its May 11, 2005 Opinion, the Bankruptcy Court expressly stated, "[a]ssuming, but not so finding, that [the JG property] is as alleged by [the Creditor's

11

Committee], $2,100,000, . . . JCL received more than it transferred to [Jumer] and . . . did receive *reasonably equivalent value*." [Id. at 12-13 (emphasis in original)].

Based on the fact the Bankruptcy Court clearly viewed the disputed evidence in the light most favorable to the Creditor's Committee, this Court cannot fathom why the Creditor's Committee continues to argue that the Bankruptcy Court completely ignored the evidence as to the $2,100,000 valuation of the JG property. In any event, this argument is entirely frivolous. As discussed above, the mere fact that the parties disagree as to the value of the JG property does not render summary judgment inappropriate where the fact in dispute has no affect on the outcome of the case. See Dowden, 966 F.2d at 1208. As a result, there is no genuine issue of material fact to preclude summary judgment and, to the extent that the Creditor's Committee argues otherwise -- such argument fails.

Likewise, the same is true for the Creditor's Committee's argument in regards to the value that should be attributed to the JSC accounts receivable. The Creditor's Committee takes the position that the Bankruptcy Court erred in discounting the book value of the JSC accounts receivable (from $2,767,545) to reflect its actual market value (of $17,000). Jumer, of course, disagrees. Nevertheless, this dispute between the parties has no affect on the outcome of the instant case. As the Bankruptcy

12

Court made clear to point out in its May 11, 2005 Opinion, regardless of whether the book value or market value of the JSC accounts receivable is taken into consideration, JCL still received *reasonably equivalent value* in exchange for the assets conveyed to Jumer. [Bankr. Ct. Opinion of May 11, 2005, at pgs. 12-13]. Thus, the mere fact the parties disagree as to whether the JSC accounts receivable was worth $2,767,545 or $17,000, is insufficient to preclude summary judgment.

Even if there was some validity to the Creditor's Committee's argument in regards to the value of the JSC accounts receivable, this argument has been waived on appeal because of the Creditor's Committee's failure to present it to the Bankruptcy Court below. See In re Image Worldwide, LTD., 139 F.3d at 582 ("Arguments not presented to the bankruptcy court are waived on appeal."). As the Seventh Circuit explained, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir.), cert. denied, 126 S. Ct. 746 (2005) (internal quotation omitted).

While moving for summary judgment, Jumer alleged in his briefs and at the oral hearing before the Bankruptcy Court, that it was undisputed that the market value of the JSC accounts

13

receivable was approximately $17,000.  He further argued that the Bankruptcy Court should look to the market value of the JSC accounts receivable rather than the book value when determining how much had been given and received under the IUFTA.  The Creditor's Committee, however, did not contest either of these assertions when raised in the Bankruptcy Court below.  In essence, the Creditor's Committee completely failed to "put up" any argument to the contrary.  Therefore, any attempt to now argue on appeal that the market value of the JSC accounts receivable is more than $17,000 or, that the Court should not take the market value into consideration, has been waived.  See In re Image Worldwide, LTD., 139 F.3d at 582.

**B.  The Bankruptcy Court applied the correct legal standards to define *reasonably equivalent value* under the IUFTA.**

The Court now turns to the legal standards applicable to defining what constitutes *reasonably equivalent value* under the IUFTA.  Under the IUFTA there are two types of fraudulent conveyances -- "fraud in fact" and "fraud in law".  Regan v. Ivanelli, 246 Ill. App. 3d 798, 814 (2d Dist. 1993).  It is the latter that is at issue in the instant case.[1]

Sections 160/5 and 160/6 of the IUFTA govern "fraud in law"

---

[1]  Both parties concede that the transfers in question are governed by the "fraud in law" sections of the IUFTA.  See 740 ILCS §§ 160/5, 160/6.

conveyances.[2]  See 740 ILCS §§ 160/5, 160/6.  Although, there are slight differences between the two subsections, both require that *reasonably equivalent value* be given in exchange for the transfer in question.  See Bowman, 221 Ill. App. 3d at 41. Thus, as the Bankruptcy Court correctly stated, "this Court need not distinguish its analysis between subsections 5 and 6 since the *reasonably equivalent value* analysis under both subsections are the same."  [Bankr. Ct. Opinion of May 11, 2005, at pg. 6]; see, e.g., In re Joy Recovery Tech. Corp., 286 B.R. 54, 77 (N.D. Ill. 2002).

---

[2] Section 740 ILCS 160/5(a)(2) of the IUFTA provides:
5(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or obligation incurred, if the debtor made the transfer or incurred the obligation:
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Section 740 ILCS 160/6(a) of the IUFTA provides:
6(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Because the IUFTA is a state law, this Court must attempt to predict how the Illinois courts would decide the matter at hand.  See In re Image Worldwide, LTD., 139 F.3d at 577.  In discussing the IUFTA under a prior statute, the Illinois Supreme Court identified at least one element essential to establishing a fraud in law conveyance -- "a transfer made for no or inadequate consideration[.]"  Gendron v. Chicago & N.W. Transp. Co., 139 Ill. 2d 422, 438 (Ill. 1990).  Likewise, an Illinois Appellate Court concluded that absent at least adequate consideration, there can be no *reasonably equivalent value* under the IUFTA.  Regan, 246 Ill. App. 3d at 805 (citing Gendron).

Despite these decisions, Illinois courts have done little to clarify whether other factors and circumstances should be taken into consideration when determining whether *reasonably equivalent value* has been given under the IUFTA.  See In re Image Worldwide, LTD., 139 F.3d at 577; In re Rotti, 271 B.R. at 303.  Recognizing this lack of guidance, the Seventh Circuit concluded that:

> the [I]UFTA is a uniform act, and it derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2).  Thus, we can look to interpretations of 'reasonably equivalent value' from § 548 cases, as well as cases from courts interpreting other states' versions of the [I]UFTA for assistance in predicting what an Illinois court would do.

In re Image Worldwide, LTD., 139 F.3d at 577.  What's good for the goose is good for the gander and, this Court will likewise

look to analogous interpretations of the phrase "reasonably equivalent value" under § 548 cases.  See In re Szabo, 2006 Bankr. LEXIS 24, at *57-59 (N.D. Ill. January 9, 2006) (stating that courts should look to § 548 cases of the Bankruptcy Code when determining whether reasonably equivalent value has been given or received under the IUFTA); In re Rotti, 271 B.R. 281, 301 (N.D. Ill. 2002) (same); In re Crystal Medical Prods., Inc., 250 B.R. 290, 299 (N.D. Ill. 1999) (same).

It is clear that under § 548 cases, there is no fixed formula for determining whether a transfer is reasonably equivalent in value.  In re Rotti, 271 B.R. at 303 (citing Barber v. Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir. 1997)).  The factors often utilized by courts in making this determination include: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.  In re General Search.com, 322 B.R. 836, 844 (N.D. Ill. 2005) (citing Barber, 129 F.3d at 387).  It is the plaintiff or the party challenging the transaction that carries the burden of proof as to each of these factors.  Id.; In re Crystal Med. Prods, Inc., 240 B.R. at 300.

Furthermore, whether *reasonably equivalent value* has been given is a question of fact that must be evaluated as of the

17

date of the transaction, rather than through the 20/20 vision of hindsight.  In re Joy Recovery Tech. Corp., 286 B.R. at 75. This evaluation must be done on a case-by-case basis relying upon all of the facts and circumstances surrounding the transaction in question.  See In re General Search.com, 322 B.R. at 844; In re Dunbar, 313 B.R. 430, 437 (C.D. Ill. 2004).

As the Seventh Circuit further explained, when measuring the value of the transaction to both parties, it is not only the direct benefits transferred that must be taken into consideration, but also, any indirect benefits that are "fairly concrete" in the hands of the recipient.  In re Image Worldwide, LTD., 139 F.3d at 578.  Thus, for purposes of § 548 and the IUTFA, "indirect benefits" constitute "value" and can include a wide range of intangibles such as: a corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or "synergy" within a corporate group as a whole; and a corporation's ability to retain an important source of supply or an important customer.  Id. at 578-79 (citations omitted); see also In re Fairchild Aircraft Corp., 6 F.3d 1119, 1127 (5th Cir. 1993) (holding that a corporation's ability to remain in operation is an indirect benefit that constitutes "value" for purposes of § 548).

Although the Creditor's Committee does not challenge the Bankruptcy Court's reliance upon § 548 cases to interpret the

meaning of *reasonably equivalent value* under the IUFTA, it does challenge how the Bankruptcy Court applied several of these legal principles under the facts of the instant case.

**C.    The Bankruptcy Court did not err in finding that *reasonably equivalent value* was given in light of the surrounding facts and circumstances.**

To begin with, the Creditor's Committee argues that "even though the [Seventh Circuit] acknowledged that indirect benefits of a transaction had to be considered, the real focus in determining whether a [d]ebtor has received reasonably equivalent value is the effect upon the assets of a corporation that would otherwise be available for the satisfaction of a [d]ebtor's creditors." [Appellant's Reply Br. at pg. 4]. This statement is indeed correct. When analyzing the value of a challenged transfer, a bankruptcy court must view the transaction from the vantage point of the debtor's creditors. See In re Joy Recovery Tech. Corp., 286 B.R. at 75. In doing so, the focus must be on what the debtor gave up and what it received in return that could benefit the creditors. Id.

When viewing the instant transaction from the vantage point of JCL's creditors, it is apparent that the Bankruptcy Court did not err in finding that "JCL received substantially more, in direct and indirect payments, than it gave." [Bankr. Ct. Opinion May 11, 2005, at pg. 13]. In particular, the Bankruptcy Court found that JCL transferred accounts receivables worth a

book value of $4,226,705, including $2,767,595 for the JSC accounts receivable[3] and $1,459,110 for all other accounts receivables ($2,767,595 + $1,459,110 = $4,226,705). The Bankruptcy Court also found that JCL transferred a life insurance policy with a cash value of $100,504 and three automobiles worth $64,000, resulting in a total book value of $4,391,209 worth of assets transferred ($4,226,705 + $100,504 + 64,000 = $4,391,209).[4] On the other end of this transaction, the Bankruptcy Court found that JCL received approximately $2,200,000 worth of real property (including the JG property at its alleged value of $2,100,000), $168,000 for cancellation of

---

[3] The Court notes that the Bankruptcy Court inadvertently calculated the book value of the JSC accounts receivable to be worth $2,767,595, rather than its actual book value of $2,767,545. As a result, the Bankruptcy Court's calculations are approximately $50 more than they should be. This minute miscalculation, however, bears no effect on the outcome of this case.

[4] The Bankruptcy Court also appears to have inadvertently failed to include the value of the gas station and its inventory when calculating the total book value of the assets transferred from JCL to Jumer. Both JCL and Jumer consistently argued throughout their cross-motions for summary judgment that the total book value of the assets transferred from JCL to Jumer was $4,497,652. See [Def.'s Motion for SJ at pgs. 2, 7, 19; Pl.'s Motion for SJ at pg. 4]. The Bankruptcy Court, however, calculated this amount to be $4,391,159 (subtracting the $50 miscalculation discussed above in footnote #3). The difference between the parties' calculations and the Bankruptcy Court's calculations is exactly $106,493, which is the alleged value of the gas station and its inventory. However, much like the miscalculation discussed above in footnote #3, the Bankruptcy Court's failure to include the value of the gas station and its inventory bears no effect on the outcome of this case.

lease payments for one year, and a cash infusion of $3,000,000, resulting in $5,368,000 worth of total assets received ($2,200,000 + $168,000 + $3,000,000 = $5,368,000).[5]

As a result of this transaction, JCL gave up $4,497,652[6] worth of assets that could have benefited its creditors. In return, JCL simultaneously received $5,368,000 worth of assets, including $3,000,000 in cash. Thus, immediately after the execution of the transaction in question, JCL's creditors were in a far better financial position to collect on any outstanding debt owed by JCL.

Moreover, the above analysis does not even take into consideration the fact that the actual market value of the JSC accounts receivable (at $17,000) was far less than its value on paper (at $2,767,545). In essence, JCL's creditors were unable to collect on approximately $2,750,545 worth of the JSC accounts receivable prior to it being transferred to Jumer in exchange for collectible assets ($2,767,545 - $17,000 = $2,750,545 worth of uncollectible debt). See In re Gropman, Inc., 2002 U.S. Dist. LEXIS 15654, at *11-13 (N.D. Ill. August 23, 2002)

---

[5] The Court notes that the $5,368,000 worth of total assets transferred to JCL does not include value for the indirect benefits that JCL received as a result of its improved financial structure, making it more appealing to investors and enhancing its ability to borrow working capital.

[6] This amount includes $106,493 to account for the transfer of the gas station and its inventory.

(concluding that because the transferred stock at issue was essentially worthless, despite its value on paper, it could not be considered in the calculation of whether reasonably equivalent value had been given). Therefore, when measuring what JCL gave up in comparison to what it received in return from the vantage point of its creditors, there is no doubt that JCL received more than *reasonably equivalent value*.

Nonetheless, the Creditor's Committee argues that the transaction in question eventually weakened JCL, reducing the value of its assets to its creditors and causing it to file for bankruptcy. However, as explained above, the value of the transfers in question must be evaluated at the time in which they occurred (on or shortly after July 31, 1998), not more than a year later after the debtor has eventually filed for Chapter 11 bankruptcy. See In re Joy Recovery Tech. Corp., 286 B.R. at 75. Hence, this argument is completely without merit.

Next the Creditor's Committee argues that the Bankruptcy Court erred by taking into consideration the $2,000,000 capital infusion made by Saranow in exchange for 30% of JCL's outstanding stock. The Creditor's Committee suggests that the $2,000,000 transfer from Saranow to JCL should be viewed as a completely separate transaction and not taken into consideration for purposes of determining whether JCL received *reasonably*

*equivalent value* under the IUFTA. This Court, however, disagrees.

As it has been repeatedly stated, courts generally do not elevate form over substance. Aetna Casualty & Surety Co. v. Beautiful Signs, Inc., 146 Ill. App. 3d 434, 436 (3d Dist. 1986); In re Joy Recovery Tech. Corp., 286 B.R. at 74 ("Courts will eschew appeals to form which obscure the substance of a transaction."). Where an allegedly fraudulent transfer is merely one step in a general plan, the plan must be viewed as a whole with all its composite parts taken into consideration. MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (quoting Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993)); see also In re Gropman, Inc., 2002 U.S. Dist. LEXIS 15654, at *10-11. Thus, it is well-settled that "a multilevel transaction will be collapsed and treated as a single transaction in order to determine if there was a fraudulent conveyance." In re Joy Recovery Tech. Corp., 286 B.R. at 74 (citing Van Dusen Airport Servs. Co., 910 F. Supp. at 934); HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995); see also Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 212 (3d Cir. 1990).

Here, it is undisputed that the $2,000,000 Security Purchase Agreement between JCL and Saranow was expressly related to, and, conditioned upon, the execution of the Agreement for

Sale of Real Property between Jumer and JCL. In essence, the two agreements together constituted a single, integrated transaction. See In re Gropman, Inc., 2002 U.S. Dist. LEXIS 15654, at *10-11 (finding that three separate agreements were all part of a single, integrated transaction to redeem outstanding stock). That is, neither transfer would have taken place without the consummation of both agreements. In fact, it can be argued that the $2,000,000 cash infusion received by JCL was not merely an indirect benefit of the conditions outlined in the Security Purchase Agreement but, instead, a direct benefit of the overall transaction. Either way, the Bankruptcy Court did not err in finding that *reasonably equivalent value* had been given based on the transaction as a whole.

Finally, the Creditor's Committee urges this Court to find that the Bankruptcy Court erred in requiring it to prove that *reasonably equivalent value* was not given. The Creditor's Committee argues that the burden of proof should have been shifted to Jumer because he was "not only an immediate family member [of JCL], he [was] the principal stockholder who benefited from the transaction . . ." [Appellant's Br. at pg. 12]. This argument, however, fails for several reasons.

First of all, JCL is a corporate entity and, as common sense dictates, Jumer cannot be an immediate family member of a corporation. Second, the Creditor's Committee relies on Falcon

24

v. Thomas, 258 Ill. App. 3d 900 (4th Dist. 1994), to support its argument.  This reliance, however, is greatly misplaced.

In Falcon, a father transferred both his truck business and his horse-breeding farm to his four sons without receiving any form of consideration in return.  258 Ill. App. 3d at 903-06. He claimed that at the time of the transfers, he was indebted to his sons, making them preferred creditors.  Id. at 905-06.  The Falcon court, however, concluded that the transfers in question were simply the father's attempt to fraudulently avoid paying his true creditors.  Id. at 906-10.

In reaching this conclusion, the court declared that "[w]here the challenged transaction involves an *immediate family member* as a preferred creditor, defendant has the burden of showing by 'clear and satisfactory proof' a valid and subsisting debt which would be enforced and payment for which would be exacted regardless of the debtor's fortune or misfortune."  Id. at 910 (emphasis added) (citations omitted).  Therefore, the Falcon decision does not stand for the proposition that when a corporation transfers property or assets to its principal shareholder, the shareholder bears the burden of proving that the transfer was for *reasonably equivalent value* under the IUFTA.

Despite the fact that the Falcon decision is inapplicable to the instant matter, the Creditor's Committee argues that

25

shifting the burden of proof to Jumer would nevertheless be consistent with Illinois corporate law, which requires a principal shareholder to prove the fairness of a transaction between himself and his corporation. See 805 Ill. Comp. Stat. 5/8.60; see also Tkachyov v. Levin, 1999 U.S. Dist. LEXIS 15221, at *13-14 (N.D. Ill. Sept. 27, 1999). The Creditor's Committee, however, has failed to allege a cause of action for breach of fiduciary duty under Illinois corporate law. See Olsen v. Floit, 219 F.3d 655, 657 (7th Cir. 2000) (stating that a breach of fiduciary duty claim is distinct from a fraudulent conveyance claim because the former is designed to protect shareholders, while the latter is designed to protect creditors). Moreover, such a claim does not arise under the Bankruptcy Code and, therefore, is not within the Bankruptcy Court's jurisdiction.

Hence, it is the legal standards applicable to the IUFTA that govern which party bears the burden of proof in the instant matter. As this Court has previously explained, it is the party challenging the allegedly fraudulent transfer that bears the burden of proving that it did not receive *reasonably equivalent value*. See In re General Search.com, 322 B.R. at 844. Here, that party happens to be the Creditor's Committee.

In addition, the Creditor's Committee fails to identify a single case in which the burden of proof was shifted onto the

principle shareholder under like circumstances.  Instead, this Court has found similar cases involving allegedly fraudulent transfers between a principal shareholder and his corporation which have not shifted the burden of proof onto the principal shareholder.  See, e.g., In re Joy Recovery Tech. Corp., 286 B.R. at 73.

Lastly, even if this Court were to shift the burden of proof onto Jumer, without actually doing so, there is sufficient evidence establishing the "fairness" of the transaction in question.  Under Illinois corporate law, "a director or officer who receives personal benefit from a transaction with the corporation must show that the transaction was 'fair' to the corporation."  Id. at 82 (applying 805 Ill. Comp. Stat. 5/8.60 to transactions between a corporation and its principal shareholder); see also Tkachyov, 1999 U.S. Dist. LEXIS 15221, at *13-14 (stating that majority shareholders owe a duty of honesty and good faith and may not profit at the corporation's expense).

However, as the Seventh Circuit explained in Olsen, "Illinois defines 'fair' as market value."  219 F.3d at 657.  Thus, "[a] transaction is 'fair' to a corporation when it receives at least what it would have obtained following arms' length bargaining in competitive markets."  Id. (citations omitted).  The evaluation of fair market value is a question of

fact that can only be set aside if found to be clearly erroneous. <u>Eyler v. Comm'r</u>, 88 F.3d 445, 451 (7th Cir. 1996).

In the instant case, there is no doubt that JCL received far more than what it would have obtained following arm's length bargaining in competitive markets. As discussed above, the fair market value of the assets transferred to JCL was worth $5,368,000, while, the fair market value of what JCL gave up in return was worth only $1,640,614. Thus, no willing buyer in competitive markets, given reasonable knowledge of the relevant facts, would have paid JCL anywhere close to what it received in return for the assets it conveyed. <u>See id.</u> (stating that a willing buyer must not be under any compulsion to buy and must have reasonable knowledge of the relevant facts surrounding the transaction). Therefore, this Court cannot say that the Bankruptcy Court clearly erred in finding that the transaction in question was "fair" to JCL.

## IV.
## CONCLUSION

After a *de novo* review of the legal standards applicable to defining the phrase "reasonably equivalent value" under the IUFTA, the Court finds that the Bankruptcy Court was correct to look to analogous interpretations of the phrase under 11 U.S.C. § 548(a)(2) of the Bankruptcy Code. Furthermore, once the Bankruptcy Court identified and applied the correct legal

28

standards, its factual finding that JCL received *reasonably equivalent value* in exchange for the assets conveyed to Jumer was not clearly erroneous. As a result, the Bankruptcy Court's Opinion of May 11, 2005 [Doc. #1] is AFFIRMED.

Entered this __27th__ day of February, 2006.

                        ____/s/ Joe B. McDade_____ _
                          JOE BILLY McDADE
                        United States District Judge